IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| KRISTYN REAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-1593 (RDA/LRV) |
| | ) | |
| IN-Q-TEL, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant's Motion to Dismiss for Failure to State a Claim (Dkt. 16) (the "Motion"). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter is fully briefed and ripe for disposition. Considering the Amended Complaint (Dkt. 11), the Motion (Dkt. 16), Defendant's Memorandum in Support of Motion to Dismiss (Dkt. 17), Plaintiff's Memorandum in Opposition to Motion to Dismiss (Dkt. 19), and Defendant's Reply Brief (Dkt. 20), this Court GRANTS the Motion for the reasons that follow.

## I. BACKGROUND

### A. Factual Background[1]

Plaintiff Kristyn Ream ("Plaintiff") has filed the instant case against Defendant In-Q-Tel, Inc. ("IQT"). Dkt. 11 ¶ 1. Plaintiff is a citizen of Fairfax County, Virginia, and was previously employed by IQT, a corporation with headquarters in McLean, Virginia. *Id.* ¶ 6.7.

---

[1] For purposes of considering the Motion to Dismiss, the Court accepts all facts contained within the Amended Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

1

Plaintiff began employment with IQT in April 2022 as Vice President of the company's Insights team, a role in which she claims she received "positive reviews and was considered for advancement." *Id.* ¶ 7. She started maternity leave under the Family and Medical Leave Act (the "FMLA") on March 31, 2023, after her child was born. *Id.* ¶ 8. When she came back from leave in July 2023, Plaintiff alleges that her role was "immediately undermined and diminished," and that managers connected her leave and childcare duties to alleged "performance issues." *Id.* ¶ 9.

In September 2023, Plaintiff alleges that the male colleague who assumed her responsibilities when she was on maternity leave, Jake Harrington, sent a draft of an article to the company's Editorial Director without allowing Plaintiff an opportunity to review it. *Id.* ¶ 10. Between September and November 2023, Plaintiff alleges she was "excluded from critical meetings, projects and decisions within her scope of responsibility," including the "Board Book and Requests for Insights." *Id.* ¶ 11. For example, in November 2023, Plaintiff alleges she was "excluded" from evaluating a Request for Insights submission, which she alleges is a duty "squarely within her position." *Id.* ¶ 12. Plaintiff further alleges that "Ms. Fox," whose first name and title are not provided in the Amended Complaint, told Plaintiff that Harrington "was continuing to meet with [Fox] 1-1 and requesting to lead the international portion of Insights without reporting to [Plaintiff], despite the International Insights already being fully integrated into the Insights process, reporting, and review chain under [Plaintiff]." *Id.* ¶ 13.

Plaintiff alleges that, on March 12, 2024, Fox told her that Harrington was "undermining her" by circumventing Plaintiff and "going directly to Fox with his own agendas." *Id.* ¶ 14. "Rather than correcting this conduct," Plaintiff alleges, Fox "entertained" these efforts to "take over [Plaintiff]'s responsibilities." *Id.* Just over a month later, on April 16, 2024, Plaintiff alleges

that Fox told her she would tell Harrington to "cut it out" but that Fox "ultimately terminated" Plaintiff's employment. *Id.* ¶ 15.

On April 25, 2024, Plaintiff received "an excellent performance review, exceeding expectations," and was never put on a Performance Improvement Plan. *Id.* ¶ 16. Nonetheless, IQT leadership continued to "erode her role" and give more of her duties to Harrington. *Id.* Plaintiff placed a male employee, "Mr. Zuluaga," on a Performance Improvement Plan at Fox's direction because he was not meeting expectations. *Id.* Zuluaga, whose first name and title do not appear in the Amended Complaint, was at some point given Plaintiff's office and continued to work at IQT through April 2025. *Id.*

Plaintiff alleges that her managers, Adrienne Lewis and Julianne Sobral, on "multiple occasions," said that Plaintiff's "difficulties" were due to "how you came back from maternity leave" and her parental duties. *Id.* ¶ 17. In June 2024, the company ended Plaintiff's supervisory responsibilities "without providing specific, actionable, or written feedback, and failed to provide any legitimate performance-based reason." *Id.* ¶ 18. In September 2024, Plaintiff alleges that Lewis (in the presence of Sobral) said her problems with Plaintiff were due to "how you came back from maternity leave." *Id.* ¶ 19. On October 2, 2024, Plaintiff "was told" by unspecified means that she had "no place on the Insights team" and was given a severance offer. *Id.* ¶ 20.

"On or about" October 15, 2024, Plaintiff alleges Fox told her she was "miserable to work for" because of her recent return from maternity leave and "with your kids always being sick." *Id.* ¶ 21. On October 21, 2024, Plaintiff alleges Sobral told her that she could not continue in her role due to "how you came back from maternity leave." *Id.* ¶ 22. Three days later, on October 24, 2024, Plaintiff alleges IQT "finalized" Plaintiff's termination but did not specify who made the decision. *Id.* ¶ 23. Plaintiff claims that men who had childcare needs were "met with empathy

3

and support" and "always granted leave without any questions asked." *Id.* Specifically, Harrington and Zuluaga took "recurrent leave" related to childcare and were not penalized. *Id.* On October 25, 2025, Sobral sent Plaintiff a new severance offer that Plaintiff declined to sign. *Id.* ¶ 24. Three days later, Plaintiff alleges Sobral again said that her termination was due to "how you came back from maternity leave." *Id.* ¶ 25.

In "approximately early November 2024," Plaintiff alleges that Sobral emailed Plaintiff asking that she resign, which Plaintiff did not do. *Id.* ¶ 26. Later that month, "in approximately mid-November" Sobral sent a letter to Plaintiff saying she was being terminated and thus needed to return equipment to IQT. *Id.* ¶ 27.

In her time working for IQT, Plaintiff alleges she was paid more than $20,000 less than the midpoint for her Vice President position and that she earned less than male Vice Presidents and Senior Directors. *Id.* ¶ 28. Plaintiff alleges that she performed "substantially equal, if not greater work" in starting a new business area, developing new products and garnering "a significant amount of new revenue" for IQT. *Id.*

In her role as Vice President of Productization—a position that Plaintiff does not state when she began—her primary job responsibility was to manage and strengthen relationships with startup companies and government agencies. *Id.* ¶ 29. To do so, she focused on "identifying and nurturing relationships with potential and existing government partners" and coordinated events, briefings and meetings with current and potential customers. *Id.*

Male Vice Presidents of Partnerships, Coley Lewis and Matt Kemph, had a "common core of responsibilities" that revolved around "driving value for government customers" via "senior level relationship and revenue-generating work." *Id.* ¶ 30. Plaintiff alleges that these positions involved managing and strengthening relationships with government agencies and coordinating

briefings, meetings and events "across the same customer and portfolio ecosystem." *Id.* ¶ 31. Plaintiff alleges that each Vice President enjoyed "substantially equal levels of customer-facing skill, effort and responsibility within the same organizational and market context." *Id.*

Plaintiff alleges that Male Vice Presidents of Technical Areas, Peter Bronez and Brian Norville, had a "substantially equal core of investment-facing work." *Id.* ¶ 32. This included meeting with "many of" the same tech companies, developing a deal pipeline, and evaluating companies for investment or "similar engagements serving government customers." *Id.* They worked directly with firms to "understand their capabilities, assess their suitability" for working with IQT, while crafting opportunities and materials "supporting executive review and approval." *Id.* ¶ 33.

Plaintiff alleges that the male Vice Presidents on the Partnerships team—Lewis, Kemph, Bronez, and Norville—earned salaries between $230,000 and $240,000, while she earned $202,000 for a job requiring "substantially equal skill, effort, and responsibility." *Id.* ¶ 34. She also alleges that men on her team –Terrence Kim, Mitch Zink, and Joel Meredith—took paternity leave "with no impact to their positions, status or performance reviews." *Id.* ¶ 36. She further alleges vaguely that Bronez "struggled to manage his team" but was nonetheless offered a promotion to Chief Data Officer; by contrast, when Plaintiff "allegedly struggled to manage her team, IQT requested her resignation." *Id.* ¶ 37. Plaintiff also alleges that she raised "concerns about pay inequity" in an April 2024 meeting with Human Resources Vice President Lauren Christmas and asked why her raise was "only 4%" as compared to the "7% raise" that a male colleague received. *Id.* ¶ 47. Plaintiff filed a discrimination charge with the U.S. Equal Employment Opportunity Commission on January 10, 2025, and received a right to sue notice on July 30, 2025. *Id.* ¶ 3.

## B. Procedural Background

On September 23, 2025, Plaintiff filed the original Complaint. Dkt. 1. On November 24, 2025, Defendant filed a Motion to Dismiss and Memorandum in Support. Dkts. 5-6. On December 9, 2025, Defendant filed Notice of Non-Opposition to the Motion to Dismiss, noting that Plaintiff did not file an opposition within 14 days of Defendant's Motion. Dkt. 10. On December 10, 2025, Defendant filed Amended Complaint and response to Defendant's Notice of Non-Opposition. Dkts. 11, 12. On December 15, 2025, this Court denied Defendant's Motion to Dismiss as moot. Dkt. 14.

On January 5, 2026, Defendant filed the instant Motion to Dismiss and Memorandum in Support. Dkts. 16, 17. On January 20, 2026, Defendant filed its Memorandum in Opposition. Dkt. 19. On January 26, 2026, Plaintiff filed her Reply. Dkt. 20.

## II. LEGAL STANDARD

To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When evaluating a motion filed under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). A plaintiff's allegations must "raise a right to relief above the speculative level," and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to meet this standard. *Id.* Generally, courts may not look beyond the four corners of the

complaint in evaluating a Rule 12(b)(6) motion, *see Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015), but they "may consider documents . . . attached to the motion to dismiss, as long as they are integral to the complaint and authentic[,]" *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

## III.  ANALYSIS

In her Amended Complaint, Plaintiff asserts four claims: (1) retaliation under the FMLA; (2) sex discrimination under Title VII of the Civil Rights Act ("Title VII") and the Virginia Human Rights Act of 1974 (the "VHRA"); (3) a violation of the Equal Pay Act (the "EPA"); and (4) retaliation under Title VII and the VHRA based on "raising concerns about pay inequity and discrimination." Dkt. 11 ¶¶ 38, 41, 44, 47.  In the Motion, Defendant moves to dismiss Count II to the extent that "any pay-differential claim . . . may be asserted," as well as Counts III and IV.  Dkt. 16.  The Court addresses each argument in turn.

### A.  Count II – Sex Discrimination (Title VII and VHRA)

The Court will analyze Plaintiff's Title VII and VHRA claims together, as the two laws use substantially identical language. *See, e.g.*, *Rose-Stanley v. Virginia*, 2015 WL 6756910, at *4 (W.D. Va. Nov. 5, 2015) (noting that, because plaintiff "has not stated any viable claim under federal law, she cannot claim an unlawful discriminatory practice under the VHRA"); *see also McCarty v. City of Alexandria*, 2024 WL 5081956, at *4 (E.D. Va. Dec. 11, 2024) (recognizing that Title VII and VHRA claims are analyzed together "because Title VII and the VHRA use substantially identical language").  To survive a motion to dismiss under Title VII, plaintiffs do not need to plead a *prima facie* case. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002). However, plaintiffs must "allege facts to satisfy the elements of a cause of action created by that statute." *McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582,

7

585 (4th Cir. 2015). This means plaintiffs must allege facts that plausibly state a violation of Title VII 'above a speculative level.'" *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 617 (4th Cir. 2020). If as here, a plaintiff chooses to proceed by way of a *prima facie* case, the plaintiff must allege facts showing: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citing *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir.2004)), *aff'd sub nom. Coleman v. Ct. of Appeals of Maryland*, 566 U.S. 30 (2012). Ultimately, Plaintiff must allege sufficient facts to establish a reasonable inference of discrimination. *See Ali v. BC Architects Eng'rs, PLC*, 832 F. App'x 167, 171 (4th Cir. 2020) (discussing whether allegations are sufficient to support a reasonable inference of discrimination sufficient to support a motion to dismiss).

Here, the focus of the parties' dispute is whether Plaintiff has plausibly alleged that she was treated differently than similarly situated male comparators. The Court notes that there is a more "relaxed standard of similarity between male and female-occupied jobs" under Title VII as compared to under the Equal Pay Act. *Lovell v. BBNT Sols., LLC*, 295 F. Supp. 2d 611, 625 (E.D. Va. 2003) (quoting *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994)). Although the standard is eased for Title VII claims, it still requires a plaintiff to be "similarly-situated *in all respects*," including job descriptions, job standards, supervisors, and "experience, education, and other qualifications," to comparators. *Spencer v. Va. State Univ.*, 919 F.3d 199, 207-08 (4th Cir. 2019) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). For example, in *Spencer*, the Fourth Circuit held that "broad generalizations" about professors performing the "same essential tasks" (like preparing lessons and managing a class) were

insufficient to show different professors were similarly situated for purposes of Title VII. *Id.* at 204.

So too here. Plaintiff relies on broad generalizations about Vice President roles sharing a "common core of responsibilities" related to "driving value for government customers" and building relationships with government partners, among other vague abstractions. Dkt. 11 ¶ 30, 31. These indistinct descriptions are in line with the allegations made, and founds to be insufficient, in *Spencer*. *See also, e.g., Noonan v. Consol. Shoe Co., Inc.*, 84 F.4th 566, 573 (4th Cir. 2023) (holding that employee with a different position than other employees sharing some graphic design duties did not perform similar jobs); *Chapman v. Wal-Mart*, 2021 WL 2379810, at *6 (W.D. Va. June 10, 2021) (holding that "jobs with similar titles and 'only vaguely corresponding responsibilities' are not similarly situated" (citing *Spencer*, 919 F.3d at 207)); *Coleman*, 626 F.3d at 191 (upholding a district court's grant of a motion to dismiss for a Title VII claim for failing to establish a plausible basis for believing . . . [two employees] . . . were actually similarly situated); *Gaines v. Baltimore Police Dep't*, 657 F. Supp. 3d 708, 736 (D. Md. 2023) (holding that at the motion to dismiss stage, a plaintiff "should still identify the comparator and establish a plausible basis for believing [the employee was] actually similarly situated") (internal citations omitted). Moreover, Plaintiff does not allege that she and her comparators shared the same supervisors or had the same level of qualifications. *Monk v. Potter*, 723 F. Supp. 2d 860, 877 (E.D. Va. 2010) ("[T]wo employees who do not report to the same supervisor, do not have the same job title, or do not have the same responsibility level, are not similarly situated." (citing *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008))), *aff'd sub nom. Monk v. Donahoe*, 407 F. App'x 675 (4th Cir. 2011). For all of these reasons, Plaintiff's sex discrimination

claim under Title VII and VHRA will be dismissed to the extent Plaintiff asserts a pay differential claim.[2]

### B.  Count III – Equal Pay Act

Plaintiffs can assert claims for unequal pay "under both the Equal Pay Act and Title VII." *Brinkley-Obu*, 36 F.3d at 343.  In order to state a claim under the EPA, a plaintiff must show that the company (1) "paid higher wages to an employee of the opposite sex who (2) performed equal work on jobs requiring equal skill, effort, and responsibility, (3) under similar working conditions." *Spencer*, 919 F.3d at 203 (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)).

Here, Defendant does not contest Plaintiff's allegations for the first element: that male employees earned between $230,000 and $240,000, and she was paid $202,000 annually—less than her male coworkers.  Dkt. 11 ¶ 34; Dkt. 17.

As for the second element, "equality" for the purposes of the EPA is a "demanding threshold requirement." *Spencer*, 919 F.3d at 203.  The "[EPA] requires a comparator to have performed work 'virtually identical' (or the apparent synonym, 'substantially equal') to the Plaintiff's in skill, effort, and responsibility." *Id.* (citing *Wheatley v. Wicomico Cty.*, 390 F.3d 328, 332–33 (4th Cir. 2004)).  Plaintiffs cannot "rely on broad generalizations at a high level of abstraction" to allege this sort of equality. *Id.* (citing *Wheatley*, 390 F.3d at 332).  As discussed *supra*, the EPA standard is stricter than one for a Title VII claim.  Thus, having failed to establish a Title VII claim on this basis, Plaintiff's EPA claim also fails.  As the Fourth Circuit recognized in *Spencer*, "broad generalizations about tasks and skills, which apply to virtually all teachers, fail

---

[2] Plaintiff relies on other factual allegations – outside of similarly situated comparators – to support her claims of sex discrimination with respect to other alleged adverse employment actions in Count II.  And, Defendant did not move to dismiss Count II in its entirety.  Accordingly, the Court's decision here is limited to any claim based on an alleged pay disparity in Count II.

to satisfy her burden to show equal work." 919 F. 3d at 204. Again, Plaintiff relies on the same broad generalizations regarding the role she had as compared to other Vice Presidents, asserting that both roles "managed and deepened relationships with USG partners, were evaluated on qualitative and quantitative customer-relationship metrics, worked on pricing and structuring offerings (such as Insights products) for potential and existing government partners, and coordinated briefings, meetings, and events across the same customer and portfolio ecosystem." *Id.* ¶ 31. Because Plaintiff does not plausibly claim that she and her comparators performed "equal work on jobs requiring equal skill, effort, and responsibility"—*i.e.* that the roles are substantially equal—this count will also be dismissed.

In her Opposition, Plaintiff argues that the precedential case law supporting Defendant's Motion to Dismiss comprises only cases decided after discovery had been conducted. Dkt. 19 at 4. However, at this stage, Plaintiff still needs to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (2009) (quoting *Twombly*, 550 U.S. at 570 (2007)). These cases provide guidance as to which facts (whether alleged at the motion-to-dismiss stage or supported by competent evidence at the motion-for-summary-judgment stage) would be sufficient to satisfy the relevant elements (which remain the same no matter the stage of the proceeding). Accordingly, district courts routinely consider these cases as appropriate in deciding motions to dismiss. *See Michael v. Virginia Dep't of Transportation*, 2022 WL 3569004, at *3 (E.D. Va. Aug. 18, 2022) (citing *Spencer* in granting a motion to dismiss an EPA claim for failing to sufficiently plead individuals held similar jobs); *Burr v. Campbell*, No. 3:21CV403, 2022 WL 982236, at *5 (E.D. Va. Mar. 30, 2022) (citing *Spencer* in granting a motion to dismiss for plaintiff failing to establish a "plausible EPA violation"). This Court does the same here.

In the alternative, this count will also be dismissed because Plaintiff's Amended Complaint did not sufficiently allege the third element, which requires that Plaintiff and her comparators were working "under similar working conditions." *Spencer*, 919 F.3d at 203. "Working conditions" for the purposes of the EPA consist of "two subfactors: 'surroundings' and 'hazards.'" *See Corning*, 417 U.S. at 202. Plaintiff did not include any reference to the working conditions in her Amended Complaint. Dkt. 11. Although Plaintiff belatedly references such conditions in her Opposition, Dkt. 19 at 3, "it is . . . 'axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.'" *Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F. Supp. 2d 909, 917 n.9 (E.D. Va. 2004) (citation omitted). Therefore, Count III will also be dismissed for failure to sufficiently plead that Plaintiff and her comparators performed their jobs under "similar working conditions."

In sum, because Plaintiff has failed to sufficiently plead that she performed equal work for jobs requiring equal skill, effort, and responsibility and under similar working conditions, Count III will be dismissed.

### C. Count IV – Retaliation (Title VII and VHRA)

As stated previously in the analysis of Count II, the Court will analyze Plaintiff's Title VII and VHRA claims together. To state a *prima facie* case of retaliation, a plaintiff must plausibly allege "(1) that [s]he engaged in protected activity, (2) that the employer took a materially adverse action against [her] and (3) there is a causal connection between the protected activity and the adverse action." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 195 (4th Cir. 2019) (internal citations omitted). A materially adverse action is one that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54 (2006). The resulting harm must be a "*significant detriment*" to the plaintiff

12

and not "relatively insubstantial or trivial." *Laird v. Fairfax Cnty.*, 978 F.3d 887, 893 (4th Cir. 2020) (quoting *Burlington N.*, 548 U.S. at 68) (emphasis in original).

As for the first element, the Fourth Circuit has held that an employee's complaint is "protected activity when the employer understood, or should have understood, that the plaintiff was opposing discriminatory conduct." *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012) (citing *Richardson v. Richland Cnty. School Dist. No. 1*, 52 F. App'x 615, 617 (4th Cir. 2002)); *see also Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021) (holding that an employee's complaints to human resources constitute "protected activity"). Here, Plaintiff plausibly engaged in a protected activity by voicing concerns about "pay inequity" and her raise being lower than that of male coworkers in a meeting with human resources in April 2024. Dkt. 11 ¶ 47.

As for the second element, a materially adverse action for purposes of Title VII is one in which the "employer's actions [are] harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 57. Typically, "[a]n adverse action is one that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Therefore, Plaintiff's alleged removal from management and termination plainly constitute adverse actions for the purposes of Title VII. Dkt. 11 ¶ 48.

However, Plaintiff's claim fails because she insufficiently pleads the third element. "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352

13

(2013). Specifically, to succeed on a Title VII retaliation claim, "a plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021). Here, Plaintiff fails to allege that the decisionmaker, whoever that may be, reduced Plaintiff's responsibilities and ultimately terminated her employment knew of the complaints made to Human Resources. *See Roberts*, 998 F.3d at 124. Plaintiff's allegations regarding who made the decision to terminate her are contradictory. Plaintiff suggests that Fox "terminated" Plaintiff but later suggests Sobral did. Dkt. 11 ¶ 15, 27. She also alleges she was "terminated by In-Q-Tel" generally. *Id.* ¶ 27. Nowhere does Plaintiff allege that Fox or Sobral knew of the meeting with Human Resources, nor does she clearly indicate who the decisionmaker was.

Indeed, the only allegations Plaintiff makes to support an inference of causation are temporal, and the time between the protected activity and adverse actions is too long to sustain the pleading burden on its own. Plaintiff alleges that she raised "concerns about pay inequity" in an April 2024 meeting with Christmas and asked why her raise was "only 4%" as compared to the "7% raise" that a male colleague received. Dkt. 11 ¶ 47. According to Plaintiff's own representations, however, she was not removed from her "supervisory responsibilities" until June 2024, two months after the meeting, and she was not terminated until October 24, 2024, six months after the meeting. *Id.* ¶ 18. Although the Fourth Circuit has held that there is not a "bright-line rule for when temporal proximity helps or hurts a cause of action for retaliation," a two-month gap is "sufficiently long so as to weaken significantly the inference of causation between the two events." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 219 (4th Cir. 2022) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)). In this case, the significant gap in time between the meeting and Plaintiff's reduction in authority (two months) and ultimate termination (six

14

months) substantially weakens any inference of causation. And, where, as here, there are no other facts alleged that could support such an inference, Plaintiff has failed to plausibly allege causation.

In Opposition, Plaintiff now asserts that she was terminated *two weeks* after the meeting; however, as discussed *supra*, a plaintiff may not amend her pleading through briefing, and, in any event, her belated assertions are directly contradicted by her Amended Complaint. *Contrast* Dkt. 19 at 6, *with* Dkt. 11 ¶ 18, 23. Accordingly, this new assertion cannot remedy the defect in her Amended Complaint.

Therefore, given the significant temporal gap and Plaintiff's failure to allege that the relevant decisionmaker knew of her engagement in a protected activity, Plaintiff has failed to state a claim for retaliation in violation of Title VII and the VHRA. Thus, Count IV will also be dismissed.

***

Given the deficiencies noted, coupled with the fact that Plaintiff has previously been granted leave to amend and is represented by counsel, amendment appears futile[3] and thus Plaintiff will not be permitted leave to further amend.

## IV. CONCLUSION

Accordingly, it is hereby

---

[3] The Court will not permit amendment based on counsel's unsupported and unexplained contention in the Opposition that Plaintiff was terminated two weeks after her April 2024 complaint. The Opposition proffers no explanation for this new assertion nor does counsel explain how such assertion can be squared with the allegations in the Amended Complaint, including multiple paragraphs alleging factual developments between April and October 2024 indicating that Plaintiff remained employed by Defendant during that period, and counsel's obligations under Rule 11. Dkt. 11 ¶¶ 16-22. Accordingly, there appears to be no basis on which to permit further amendment.

ORDERED that Defendant In-Q-Tel Inc.'s Motion to Dismiss (Dkt. 16) is GRANTED; and it is

FURTHER ORDERED that Count II is DISMISSED WITH PREJUDICE to the extent that Defendant asserts a pay differential claim; and it is

FURTHER ORDERED that Count III is DISMISSED WITH PREJUDICE in its entirety; and it is

FURTHER ORDERED that Count IV is DISMISSED WITH PREJUDICE in its entirety; and it is

FURTHER ORDERED that a scheduling order shall be issued promptly as to the remaining counts.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to all counsel of record.

It is SO ORDERED.

Alexandria, Virginia
July __15__, 2026

_____ /s/

Rossie D. Alston, Jr.
United States District Judge

16